UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civil File No. 25-cv-02668-KMM-DTS |
| Plaintiff, | |
| vs. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| Tim Walz, the Governor of Minnesota in his official capacity; State of Minnesota; Keith Ellison, Attorney General for the State of Minnesota in his official capacity; Minnesota Office of Higher Education, | |
| Defendants. | |

## INTRODUCTION

Over forty years ago, the Supreme Court recognized that denying education to undocumented immigrants "raises the specter of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe*, 457 U.S. 202, 218 (1982); *see also id.* at 208 ("Without an education, these undocumented children, already disadvantaged as a result of poverty, lack of English-speaking ability, and undeniable racial prejudices will become permanently locked into the lowest socio-economic class." (cleaned up)). Recognizing these realities, Minnesota has committed to providing affordable postsecondary education to all students with *bona fide*

connections to Minnesota regardless of immigration status. The United States contends that federal law prohibits Minnesota from doing so.

The issues on this motion turn not on the prudence of the State's policy choices but on familiar issues of statutory interpretation and federalism. Federal law purports to prohibit states from providing postsecondary education benefits to undocumented immigrants "on the basis of residence" unless U.S. citizens are eligible for the same benefits without regard to residence. This law regulates states, not private actors, and therefore has no preemptive effect. But even if it did, state law does not conflict with federal law. Minnesota does not provide benefits to undocumented students on the basis of residence: Any student that attends and graduates from a Minnesota high school is eligible, and non-Minnesota residents (both citizens and noncitizens) may qualify. Moreover, Minnesota makes U.S. citizens eligible for the same benefits without regard to their residence. The United States's reading of the statute—that no state may provide any postsecondary education benefit to any undocumented student unless it provides this benefit to all U.S. citizens—not only contravenes the statutory language but also raises serious Tenth Amendment concerns. For these reasons, the Court should dismiss the complaint with prejudice.

## BACKGROUND

I.   SECTION 1623 OF THE ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). *See* Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996). The second subchapter of the IIRIRA outlines the eligibility of immigrants for state and local

benefits programs. Section 1621 provides a general rule that undocumented immigrants are "ineligible" for such benefits, unless certain exceptions apply. 8 U.S.C. § 1621(a). One such exception is that a state may make an undocumented immigrant "eligible for any State or local benefit . . . only through the enactment of a State law . . . which affirmatively provides for such eligibility." *Id.* § 1621(d).

Another provision in this subchapter, Section 1623, places certain limits on such state laws. *Id.* § 1623(a) ("Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits"). Section 1623(a) provides:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a).

## II.    THE 2013 MINNESOTA DREAM ACT AND THE 2023 NORTH STAR PROMISE.

The State of Minnesota makes significant investments in its public higher education institutions. *See, e.g.*, 2025 Minn. Laws, ch. 5, art. 1. The State aims to ensure its institutions provide quality education, foster student success, promote democratic values, and train highly skilled and adaptable individuals that can enter the state's workforce and contribute to the economy. Minn. Stat. § 135A.011. The State also believes it is important to provide "an opportunity for all Minnesotans, regardless of personal circumstances, to participate in higher education." *Id.* To this end, the State set ambitious goals to increase

the proportion of Minnesota residents 25 to 44 years old who hold postsecondary credentials to at least 70 percent by 2025 and to close achievement gaps across race and ethnicity groups.  Minn. Stat. § 135A.012.  In recognition of these goals, the Minnesota legislature has committed to providing at least 67 percent of the combined revenue for public postsecondary institutions.  Minn. Stat. § 135A.01.

The State also has acted to make higher education possible for more Minnesota students and families, including by offering in-state tuition and financial aid to eligible students regardless of their immigration status.  In 2013, Minnesota enacted the Minnesota Dream Act (also called the Prosperity Act), which extended opportunities for undocumented students to attend the State's public universities and colleges by providing benefits consistent with those already received by U.S. citizens and nationals.  2013 Minn. Laws, ch. 99, art. 4.  In passing this Act, Minnesota followed in the footsteps of states across the country that had passed similar laws on a bipartisan basis.  *See, e.g.*, Cal. Educ. Code § 68130.5; Conn. Gen. Stat. § 10a-29; 110 Ill. Comp. Stat. 305/7e-5; Kan. Stat. Ann. § 76-731a; Md. Code Ann., Educ. § 15-106.8; Neb. Rev. Stat. § 85-502; N.M. Stat. Ann. § 21-1-4.6; N.Y. Educ. Law § 355(2)(h)(8); Utah Code Ann. § 53B-8-106; Wash. Rev. Code § 28B.15.012.

The Minnesota Dream Act permits both citizens and noncitizens[1] to qualify for a "resident tuition rate or its equivalent at state universities and colleges." Minn. Stat. § 135A.043(a). It provides in relevant part:

> (a) A student, other than a nonimmigrant alien within the meaning of United States Code, title 8, section 1101, subsection (a), paragraph (15), shall qualify for a resident tuition rate or its equivalent at state universities and colleges if the student meets all of the following requirements:
>
> (1) high school attendance within the state for three or more years;
>
> (2) graduation from a state high school or attainment within the state of the equivalent of high school graduation; and
>
> (3) in the case of a student without lawful immigration status: (i) documentation that the student has complied with selective service registration requirements; and (ii) if a federal process exists for the student to obtain lawful immigration status, the student must present the higher education institution with documentation from federal immigration authorities that the student has filed an application to obtain lawful immigration status.

*Id.*

The Minnesota legislature also defined the term "resident student" to include, among others, students who meet the Minnesota Dream Act criteria. *See* Minn. Stat. § 136A.101, subd. 8(9). "Resident students" are eligible for various tuition assistance and financial aid packages (if other criteria are also met). *See, e.g.,* Minn. Stat. §§ 135A.165, 136A.126; 2025 Minn. Laws, ch. 5, art. 2, § 61.

---

[1] Both citizens and noncitizens can take advantage of the Minnesota Dream Act. The only exclusion is "nonimmigrant aliens," a category that includes, for example, tourists and foreign diplomats. *See* 8 U.S.C. § 1101(a)(15).

In 2023, Minnesota strengthened its commitment to providing affordable college education by establishing the North Star Promise.  *See* 2023 Minn. Laws, ch. 41, art. 2, § 19.  Students who are eligible for the North Star Promise receive "resident tuition rates." Minn. Stat. § 136A.1465, subds. 1 and 1a.  The North Star Promise also offers free tuition at Minnesota's public colleges and universities for qualifying students with family incomes under $80,000.  *See* Minn. Stat. § 136A.1465.  Students who meet the Minnesota Dream Act criteria are among the students eligible for the North Star Promise.  *Id*. at subd. 1(1); Minn. Stat. § 136A.101, subd. 8(9).

## III.  THE PRESENT LAWSUIT.

Twelve years after the enactment of the Minnesota Dream Act, the United States claims for the first time that Section 1623 expressly preempts the Minnesota Dream Act and North Star Promise to the extent they offer benefits to undocumented students.[2]  The United States has sued the State of Minnesota, the Minnesota Office of Higher Education, Minnesota Governor Tim Walz, and Minnesota Attorney General Keith Ellison.

## LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states "a claim to relief that is plausible on its face."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court may

---

[2] The United States has recently brought two similar suits challenging Texas and Kentucky's tuition policies. *See United States v. Texas*, No. 7:25-cv-00055 (N.D. Tex.); *United States v. Beshear*, No. 3:25-cv-00028-GFVT (E.D. Ky.).

consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). Although the Court construes the complaint in the light most favorable to the plaintiff, *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009), the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## ARGUMENT

### I.    SECTION 1623 DOES NOT EXPRESSLY PREEMPT THE MINNESOTA DREAM ACT OR NORTH STAR PROMISE.

Minnesota is committed to ensuring that undocumented students who attend and graduate from Minnesota high schools can afford to attend Minnesota's public universities and colleges. Federal law does not prohibit it from doing so. First, Section 1623 purports to regulate states, not individuals, and therefore has no preemptive effect. Second, even if Section 1623 had preemptive effect, the challenged Minnesota laws do not run afoul of the requirement that states shall not provide benefits to undocumented students on the basis of residence unless the same benefits are provided to citizens without regard to residence. As discussed below, the Minnesota Dream Act and North Star Promise do not provide benefits to undocumented students based on residence in Minnesota. And even if they did, U.S. citizens may also be eligible for such benefits without residing in Minnesota. The United States's reading of Section 1623 is contrary to its plain language and would infringe state sovereignty in violation of the Tenth Amendment.

A.    **Section 1623 Has No Preemptive Effect Because It Does Not Regulate The Conduct Of Private Actors.**

As a threshold matter, the Supreme Court's decision in *Murphy v. NCAA*, 584 U.S. 453 (2018) provides an independent reason for the Court to dismiss the preemption claim.    "[T]o preempt state law," a federal law "must satisfy two requirements." *Murphy*, 584 U.S. at 477.  "First, it must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do." *Id.*  "Second, since the Constitution 'confers upon Congress the power to regulate individuals, not States,'" the provision "must be best read as one that regulates private actors." *Id.* (quoting *New York v. United States*, 505 U.S. 144, 177 (1997)).  Because Section 1623 does not regulate private actors, it does not have preemptive effect.

*Murphy* concerned a federal statute that made it "unlawful for a state to 'authorize' sports gambling schemes." *Id.* at 458.  The Court acknowledged that this provision "unequivocally dictate[d] what a state legislature may and may not do." *Id.* at 474. Accordingly, the Court held that it was "clear" that the provision was "not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors." *Id.* at 479-80; *see also id.* at 480 ("[T]here is simply no way to understand the provision prohibiting state authorization as anything other than a direct command to the States.").

Similarly here, Section 1623 does not regulate private actors—it provides a limit on states and state laws.  Even the complaint recognizes that Section 1623 "does not allow *for states* to provide illegal aliens with lower in-state tuition rates . . . based on residence within

8

the state if that same tuition rate is not made available to all U.S. citizens without regard to their state residency." (Compl. ¶ 18.) Courts have also interpreted Section 1623 to be directed at the states. *See, e.g.*, *Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304, 313 (5th Cir. 2023) ("[T]he statute expressly preempts *state rules* that grant illegal aliens benefits when U.S. citizens haven't received the same." (emphasis added)); *Martinez v. Regents of Univ. of Calif.*, 241 P.3d 855, 863 (Cal. 2010) ("Section 1623(a) *prohibits a state* from making unlawful aliens eligible 'on the basis of residence within a State' for a postsecondary education benefit." (emphasis added)).

Other courts have relied on *Murphy* to reject arguments that another provision of federal immigration law, 8 U.S.C § 1373—which bars state and local governments from "prohibit[ing]" or "restrict[ing]" their officials from sending immigration-related information to the federal government—preempts state laws imposing restrictions on information sharing. *See, e.g.*, *Ocean Cnty. Bd. of Comm'rs v. Attorney Gen. of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021) ("A federal statute that does not regulate private actors cannot serve as a basis for preemption."); *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020) ("By their plain terms, the provisions affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption.").

Because there is no way to understand Section 1623 "as anything other than a direct command to the States," the statute is not a valid preemption provision, and the Court should dismiss the complaint. *Murphy*, 584 U.S. at 480.

**B.    The Minnesota Dream Act and North Star Promise Are Not Preempted Under the Plain Text Of Section 1623.**

Under the Supremacy Clause of the Constitution, "state laws that conflict with federal law are 'without effect.'"    *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment[.]"    *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1174 (8th Cir. 2023) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). Only express preemption is at issue here. (Compl. ¶¶ 39-43, 50.)

Even if Section 1623 were a valid preemption provision, that "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains."    *Altria*, 555 U.S. at 76.   Courts "focus first on the statutory language, 'which necessarily contains the best evidence of Congress' pre-emptive intent.'"    *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993)).

"When addressing express or implied preemption," the Court must "begin 'with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"    *R.J. Reynolds*, 60 F.4th at 1176 (quoting *Altria*, 555 U.S. at 77); *see also Pharm. Research & Mfrs. Of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024).   "This assumption is especially

important when Congress legislates in a field traditionally occupied by the States." *R.J. Reynolds*, 60 F.4th at 1176.  Education falls within the states' core police powers. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 580-81 (1995) (Kennedy, J., concurring) ("[I]t is well established that education is a traditional concern of the States"); *Barbier v. Connolly*, 113 U.S. 27, 31 (1884) (states have police power to adopt regulations to promote "education" of their citizens).  As a result, "when the text of a pre-emption clause is susceptible of more than one plausible reading," courts "accept the reading that disfavors pre-emption.'"  *R.J. Reynolds*, 60 F.4th at 1176 (quoting *Altria*, 555 U.S. at 77).

Section 1623 does not preempt the Minnesota Dream Act and North Star Promise under its plain language.  Section 1623 does not purport to categorically prohibit postsecondary education benefits for undocumented students.  *See Martinez*, 241 P.3d at 864 ("[S]ection 1623 does not impose an absolute ban" on education benefits to undocumented students).  Instead, it provides that undocumented students "shall not be eligible" for such benefits "*on the basis of residence within a State* (or a political subdivision)" unless "a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident."  8 U.S.C. § 1623(a) (emphasis added); *see also Martinez*, 241 P.3d at 864 ("The reference to the benefit being on the basis of residence must have some meaning.  It can only qualify, and thus limit, the prohibition's reach.").

Assessing whether the Minnesota Dream Act and North Star Promise are within the scope of Section 1623's purported preemption is therefore a two-step process: first, this Court must determine if undocumented students receive benefits "on the basis of

residence." If not, there is no preemption. If so, the Court must also determine whether a U.S. citizen or national is eligible for the same benefits without regard to whether he or she is such a resident. If so, there is still no preemption.

   1.    **Minnesota law does not provide postsecondary education benefits "on the basis of residence."**

   The inquiry here ends at step one because the Minnesota Dream Act and North Star Promise do not provide benefits to undocumented students "on the basis of residence." None of the Minnesota Dream Act criteria (which are incorporated into the North Star Promise) look to where the student lives; they look instead to where a student attended and graduated from high school. Minn. Stat. § 135A.043(a)(1)-(2). In the case of an undocumented student, they also require that the student comply with selective service registration requirements and apply for lawful status if possible. Minn. Stat. § 135A.043(a)(3).

   In the only on-point decision addressing this issue, the California Supreme Court upheld a nearly identical statute[3] against a Section 1623 preemption challenge because its criteria "cannot be deemed to be based on residence[.]" *Martinez*, 241 P.3d at 863. The court noted California's statute ("section 68130.5") did not provide benefits "based on residence for the simple reason that many *nonresidents* may qualify for it." *Id.* at 864. In

---

[3] The statute at issue in *Martinez* provided resident tuition rates at certain California public colleges for any student matriculating in fall 2001 or later who (1) attended high school in California for three or more years, (2) graduated from a California high school or attained the equivalent thereof, and (3) in the case of an undocumented student, filed an affidavit stating he or she has applied for legal status or will apply as soon as he or she is eligible to do so. *See Martinez*, 241 P.3d at 861 (discussing Cal. Educ. Code § 68130.5 as it existed at the time).

fact, "[e]very nonresident who meets section 68130.5's requirements—whether a United States citizen, a lawful alien, or an unlawful alien—is entitled to the nonresident tuition exemption." *Id.*

As in *Martinez*, there are at least three ways a non-Minnesota resident may satisfy the Minnesota Dream Act criteria: first, students in neighboring states or Canada may attend high school in Minnesota. *Cf. id.* Minnesota law specifically authorizes these students to attend Minnesota public schools. *See* Minn. Stat. §§ 124D.04, 124D.041. Of course, no legislative permission is necessary for out-of-state students to attend Minnesota's private schools. Second, out-of-state students who attend a Minnesota boarding school may meet the criteria despite maintaining their residence out of state. *Cf. Martinez*, 241 P.3d at 864. Third, a student who attended and graduated from a Minnesota high school and then moved out of state may meet the criteria despite no longer being a Minnesota resident. *Cf. id.*

And significant numbers of Minnesota residents will *not* qualify under the Minnesota Dream Act. For example, Minnesota residents (both citizens and noncitizens) who completed less than three years of high school in Minnesota or graduated from high school elsewhere are ineligible under the Minnesota Dream Act even if they have lived in Minnesota for decades.

The Minnesota Dream Act criteria are both broader and narrower than a Minnesota residency requirement, sweeping in some nonresidents and excluding some residents. The Minnesota Dream Act and North Star Promise therefore do not provide benefits to undocumented students "on the basis of residence." It is true that many students who

qualify under the Minnesota Dream Act will also be Minnesota residents, but that is not prohibited by Section 1623. Congress did not regulate benefits provided to groups that *include* residents so long as residency is not the basis for inclusion or exclusion. Any argument that the Minnesota Dream Act falls within Section 1623's scope impermissibly reads "on the basis of residence" out of Section 1623. *See Martinez*, 241 P.3d at 864 ("Congress specifically referred to *residence*—not some form of surrogate for residence— as the prohibited basis for granting unlawful aliens a postsecondary education benefit.").

Not only does a plain reading of the statutory text undermine the United States's argument, but there is no caselaw supporting preemption. In fact, no court has ever held that *any* state law was preempted by Section 1623. The complaint references *Young Conservatives*, 73 F.4th 304. (*See* Compl. ¶¶ 35, 38-40, 43.) In that case, the court found the Texas statute at issue was not preempted. *See Young Conservatives*, 73 F.4th at 313. The court suggested—in dicta—that "a different, *unchallenged*" Texas statute "seem[ed] to conflict with § 1623(a)." *Id.* at 314. But the unchallenged Texas provision made undocumented students eligible for a resident tuition rate based on their residence in Texas. *See id.* at 308 ("So long as they satisfy the statute's residency requirements, illegal aliens are eligible for Texas resident tuition."); *see also* Tex. Educ. Code § 54.052. The Fifth Circuit's observations regarding the Texas tuition scheme, which provided benefits on the basis of residence, are inapplicable to the Minnesota Dream Act, which does not.

*Equal Access Education v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004), another case relied on the complaint, is also inapposite. (*See* Compl. ¶ 43.) *Merten* did not concern the alleged preemption of state law under Section 1623. In that case, the plaintiffs

challenged a policy barring undocumented students from admission to Virginia's public colleges.  They argued, among other things, that Section 1623 implicitly allows undocumented students to attend public colleges or there would be no need to restrict the benefits they can receive.  The court disagreed, finding that "[w]hile § 1623 may reflect that Congress is aware that illegal aliens may be attending some public colleges and universities, that section by no means warrants the conclusion that . . . defendants may not deny admission to illegal aliens."  *Merten*, 305 F. Supp. 2d at 606.

Having disposed of the issue, the court went on to say that "[t]he more persuasive inference to draw from § 1623 is that public post-secondary institutions need not admit illegal aliens at all, but if they do, these aliens cannot receive in-state tuition unless out-of-state United States citizens receive this benefit."  *Id*.  This is clear dicta, as it was irrelevant to the case and postsecondary education benefit issues were not before the court.  And it is clearly wrong: this off-the-cuff take, written without the benefit of relevant briefing, ignores that Section 1623 only concerns benefits provided "on the basis of residence."  But even if it were a correct statement, as discussed below, "out-of-state United States citizens," *id.*, do receive the same benefits as undocumented students under the Minnesota Dream Act.

Finally, the complaint relies on a recent consent judgment regarding Texas's tuition laws.  (*See* Compl. ¶ 44 & Ex. A.)  In fact, this consent judgment is the complaint's sole exhibit.  (*Id.* Ex. A.)  But the consent judgment does not support the preemption claim for at least two reasons.  First, as discussed above, the Texas tuition scheme is extremely different from Minnesota's in that it makes undocumented students eligible for in-state

tuition because they reside in Texas.  *See* Tex. Educ. Code §§ 54.052(a)(3), 54.053(3)(B).

Any findings with respect to those statutes are simply irrelevant to Minnesota's statute.

Second, consent judgments are entitled to no weight.  "[T]he central characteristic of a consent judgment is that the court has not actually resolved the substance of the issues presented."  18A Wright & Miller's Federal Practice & Procedure Juris. § 4443 (3d ed. 2025).  "The judgment results not from adjudication but from a basically contractual agreement of the parties."  *Id.*  "Because the reasoning of a consent judgment is not necessarily that of the court, it has no precedential value, and cannot be considered the court's 'opinion.'"  *Gascho v. Global Fitness Holdings*, 918 F. Supp. 2d 708, 715 (S.D. Ohio 2013).

The circumstances surrounding *this* consent judgment are particularly suspect.  The United States filed its complaint on June 4, 2025 in the Wichita Falls Division of the Northern District of Texas, a "single-judge" division where the case was guaranteed to draw a particular judge.  (Compl. Ex. A.)  The court entered the consent judgment *that same day*. (*Id.*)  The only possible inference is that there was never any real case or controversy: this was a collusive settlement agreed to in advance between the United States and the Texas Attorney General to nullify a state law by agreement instead of by judicial decision or legislative action.

In short, the United States's express preemption claim fails because Section 1623 only applies where states grant benefits to undocumented students based on their residence, and eligibility under the Minnesota Dream Act is not based on residence.

### 2. Minnesota law makes U.S. citizens eligible for postsecondary education benefits without regard to their residence in Minnesota.

Even assuming the Minnesota Dream Act criteria are based on residence (which they are not), Section 1623 permits that so long as a U.S. citizen or national is eligible for the same benefit without regard to his or her residence. *See* 8 U.S.C. § 1623(a); *Arizona ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd.*, 416 P.3d 803, 807 (Ariz. 2018); *see also Young Conservatives*, 73 F.4th at 313 ("[I]f a state did not make U.S. citizens eligible, illegal aliens cannot be eligible."). Under Minnesota law, nonresidents—whether citizens, nationals, lawfully present immigrants, or undocumented immigrants—are eligible for the postsecondary education benefits at issue here.

The United States comes to a different conclusion by misreading Section 1623. When interpreting a statute, a court's first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *LaCurtis v. Express Med. Transporters, Inc.*, 856 F.3d 571, 578 (8th Cir. 2017) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "To decide whether the statutory language is plain or ambiguous, courts refer 'to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Frost v. Lion Brand Yarn Co.*, 765 F. Supp. 3d 808, 812 (D. Minn. 2025) (quoting *LaCurtis*, 856 F.3d at 578). "The court engaging in this task uses the ordinary meaning of terms in the statute." *Id.*

The complaint misconstrues the ordinary meaning of Section 1623 in two fundamental ways. First, the United States alleges that "Section 1623 requires that *all*

U.S. citizens be eligible for a benefit, without regard to residency, before any alien not lawfully present in the United States can be eligible to receive the same benefit." (Compl. ¶ 46 (emphasis added).) Despite the United States's repeated assertions, Congress used the phrase "a citizen or national," not "all citizens or nationals." (*See* Compl. ¶¶ 18, 46, 50.) "All" and "a" have different meanings. *Compare Edwards v. McMahon*, 834 F.2d 796, 799 (9th Cir. 1987) ("All means every") *with KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("a" means "one or more"). And the court must interpret "the ordinary meaning of terms in the statute"—not in the complaint. *Frost*, 765 F. Supp. 3d at 812.

Second, the United States alleges that Section 1623 "preempts Minnesota's statutes that grant benefits to aliens not lawfully present in the United States when U.S. citizens do not receive the same." (Compl. ¶ 47.) But Section 1623 only directs states to make a U.S. citizen or national "eligible for" such a benefit; it does not require states to "grant" or "bestow[]" such benefits on U.S. citizens, as the United States alleges. (Compl. ¶¶ 47-48.) The ordinary meaning of "eligible" connotes qualification for a benefit, not entitlement to that benefit. *Eligible*, Meriam-Webster.com, https://www.merriam-webster.com/dictionary/eligible (last visited July 18, 2025) ("eligible" means "qualified to participate or be chosen"); Black's Law Dictionary (12th ed. 2024) ("eligible" means "[f]it and proper to be selected or to receive a benefit; legally qualified for an office, privilege, or status"). *See also I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 444 (1987) ("those who can only show a well-founded fear of persecution are not *entitled* to anything, but are *eligible* for the discretionary relief of asylum"); *Jarecha v. I.N.S.*, 417 F.2d 220, 223

(5th Cir. 1969) ("an applicant who meets the objective prerequisites is merely eligible for adjustment of status, he is in no way entitled to such relief").

With the plain meaning of Section 1623 so understood, the state laws at issue are clearly not in conflict with federal law. The Minnesota Dream Act and North Star Promise allow U.S. citizens living outside of Minnesota to qualify for postsecondary education benefits as long as they meet certain criteria. As discussed, the Minnesota Dream Act permits nonresident U.S. citizens to qualify for in-state tuition by attending and graduating from a Minnesota high school. Minn. Stat. § 135A.043(a)(1)-(2). Moreover, as the complaint acknowledges, Minnesota permits nonresidents to qualify for in-state tuition in other ways: "[C]ertain public colleges and universities in Minnesota offer access to reduced in-state tuition to all students regardless of their immigration status or state of residence" and "Minnesota has reciprocity agreements with some neighboring states." (Compl. ¶ 31.)

Nonresident U.S. citizens are also eligible for postsecondary education benefits under the North Star Promise. Minn. Stat. § 136A.1465, subds. 1 and 1a. While students must meet the "resident student" definition, "resident student" status is not limited to Minnesota residents. For example, "resident student" includes nonresidents who meet the Minnesota Dream Act criteria. Minn. Stat. § 136A.101, subd. 8(9). "Resident student" also encompasses students that previously lived in Minnesota and graduated from a Minnesota high school or earned a GED but have since moved from the state—even if they are no longer considered a resident. *Id.* at subd. 8(3) and (4). Additionally, a student whose parent is stationed in Minnesota on active federal military service also qualifies a "resident student" regardless of residence. *Id.* at subd. 8(5).

For all these reasons, the United States is incorrect that Minnesota law "denies" benefits to U.S. citizens who are not Minnesota residents. (Compl. ¶ 20.) Even assuming Minnesota provides postsecondary education benefits to undocumented students on the basis of residence, the United States fails to state a claim because there is still no conflict between federal and state law.

### C.    The United States's Expansive Interpretation Of Section 1623 Would Result In Unconstitutional Commandeering.

Section 1623 plainly does not require a state to grant postsecondary education benefits to all U.S. citizens. Nor could it. Such an interpretation would intrude on Minnesota's sovereign interests and run afoul of the anticommandeering doctrine. *See Vlandis v. Kline*, 412 U.S. 441, 452-53 (1973) (recognizing a state's "legitimate interest in protecting and preserving the quality of its colleges and universities"). Even if there were ambiguity about the plain meaning of Section 1623, the canon of constitutional avoidance would require the court to reject the United States's broad reading. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

"[U]nder our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Preemption is "an extraordinary power in a federalist system," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), and it is not unlimited. While the Constitution confers on Congress certain enumerated powers, the Tenth Amendment reserves "all other legislative power . . . for the States." *Murphy*, 584 U.S. at 471. "[C]onspicuously absent from the list of powers given to Congress is the power to

issue direct orders to the governments of the States." *Id.* "The anticommandeering doctrine simply represents the recognition of this limit on congressional authority." *Id.*

In *Murphy*, the Supreme Court recognized that the anticommandeering doctrine serves several significant purposes. First, it "serves as one of the Constitution's structural protections of liberty" and ensures a "healthy balance of power between the States and the Federal Government." *Id.* at 473 (internal citations omitted). Second, it "promotes political accountability" so that voters know whether "to credit or blame" the federal government or the states for a particular action or regulation. *Id.* And third, it "prevents Congress from shifting the costs of regulation to the States." *Id.*

Section 1623 provides only one clear constraint on a state's right to administer postsecondary education benefits: If a state makes an undocumented individual eligible on the basis of their residence in Minnesota, then the state must also make a U.S. citizen eligible without regard to their residence in Minnesota.[4]  Minnesota law complies with this requirement. The State allows nonresidents who have an established connection to the state—like attending high school or serving in the military in the state—to be eligible for in-state tuition and state financial aid programs. Minnesota has chosen to invest in students with genuine connections to the state, whether they are residents or not, because such students will be more likely to contribute to the state's welfare and workforce upon graduation. *See* Minn. Stat. § 135A.011; *cf. Starns v. Malkerson*, 326 F. Supp. 234, 241

---

[4] Though as discussed in Section I.A., even this reading of Section 1623 arguably raises anticommandeering concerns by "dictat[ing] what a state legislature may and may not do." *Murphy*, 584 U.S. at 474.

(D. Minn. 1970) (three-judge court), *aff'd*, 401 U.S. 985 (1971) (recognizing Minnesota's right to ensure that only students who have a bona fide connection to the state can take advantage of in-state tuition rates).

The United States's expansive view of Section 1623, however, would require states to grant in-state tuition and state financial aid to *all* nonresident citizens—even citizens with no connection to the state—just because the state elected to make certain undocumented students eligible for such benefits. (Compl. ¶ 46.) But Congress's intent to completely foreclose a state's ability to determine which nonresident citizens should benefit from its in-state tuition and state financial aid programs is not "unmistakably clear in the language of the statute," especially a statute purporting to limit only the eligibility of undocumented individuals for higher education benefits. *See Gregory*, 501 U.S. at 460; *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not hide elephants in mouseholes."). This broad interpretation of Section 1623 ignores the plain text, and as a result, risks intruding on "a field traditionally occupied by the State" without a clear directive from Congress. *R.J. Reynolds*, 60 F.4th at 1176. And even if the text was ambiguous, the court should adopt the reading that disfavors preemption. *Id.*

Moreover, the United States's interpretation would result in unconstitutional commandeering as it would direct the state to either exclude undocumented students from its in-state tuition and financial aid programs or to subsidize the costs of *all* nonresidents at public higher education institutions. (*See* Compl. ¶¶ 18, 46.) This all-or-nothing directive would leave the state without any discretion to decide what students should be eligible for its in-state tuition and financial aid programs. *See Murphy*, 584 U.S. at 474 ("It is as if

22

federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals."). Congress has no power "to issue direct orders to the governments of the States." *Id.* at 471. This expansive interpretation of Section 1623 would upset the balance of power between the states and the federal government, undermine political accountability, and shift the costs of regulation to the states. Thus, the Court should reject the complaint's broad reading of Section 1623 and dismiss the express preemption claim.

*   *   *

Section 1623 does not expressly preempt Minnesota law for several independent reasons: First, Section 1623 purports to regulate states, not private actors, and therefore has no preemptive effect. Second, even if Section 1623 had preemptive effect, state laws do not conflict with federal law. Minnesota does not provide postsecondary education benefits to undocumented students "on the basis of residence," and regardless, it also makes nonresident U.S. citizens eligible for the same benefits. Finally, the United States's interpretation of Section 1623 is contrary to its plain language and would run afoul of the anticommandeering doctrine. For each of these reasons, the Court should dismiss the complaint with prejudice.

## II.   THE UNITED STATES LACKS STANDING WITH RESPECT TO GOVERNOR WALZ AND ATTORNEY GENERAL ELLISON.

"A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims." *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1063 (D. Minn. 2013). "Under

23

Rule 12(b)(1), a defendant may challenge a plaintiff's complaint for lack of subject-matter jurisdiction either on its face or on the factual truthfulness of its averments." *ARRM v. Piper*, 367 F. Supp. 3d 944, 950 (D. Minn. 2019). In a facial challenge like this one, "the nonmoving party 'receives the same protections as it would defending against a motion brought under Rule 12(b)(6).'" *Id.* (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)).

Minnesota's governor and attorney general play no role with respect to the challenged statutes. Neither statute mentions their offices, and the complaint does not allege that either the governor or the attorney general have caused any injury to the United States. With respect to Governor Walz, the complaint alleges only that he "is the Governor of Minnesota and is sued in his official capacity" and that he signed the bill enacting the North Star Promise. (Compl. ¶¶ 5, 33.) With respect to Attorney General Ellison, the complaint alleges only that he "is the Attorney General for the State of Minnesota and is sued in his official capacity." (*Id.* ¶ 7.)

Standing is a necessary component of subject matter jurisdiction. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). The plaintiff bears the burden of establishing Article III standing from the time a suit is brought and maintaining it thereafter. *Carney v. Adams*, 592 U.S. 53, 59 (2020). Among other things, standing "requires a showing that *each defendant* caused [the plaintiff's] injury and that an order of the court against *each defendant* could redress the injury." *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (emphases added); *see also Murthy v. Missouri*,

603 U.S. 43, 44 (2024) ("plaintiffs must demonstrate standing . . . against each defendant" (internal quotation marks omitted)).

When a plaintiff challenges a statutory provision, "the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007)); *see also Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019); *Calzone*, 866 F.3d at 869; *Balogh v. Lombardi*, 816 F.3d 536, 543 (8th Cir. 2016); *Doe v. Piper*, 165 F. Supp. 3d 789, 797 (D. Minn. 2016) ("A federal court may not hear a complaint against a government official if the official is unconnected to the enforcement of the complained-of law."). Similarly, "[t]he redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." *Digital Recognition*, 803 F.3d at 958 (quoting *Bronson*, 500 F.3d at 1111).

Neither the governor nor the attorney general has a sufficient connection to the challenged statutes to confer standing upon the United States. Neither the Minnesota Dream Act nor the North Star Promise make any mention of the governor or attorney general. Neither the governor nor the attorney general has any "enforcement" role to play with respect to the statutes, and the United States does not allege any facts suggesting otherwise. In fact, the complaint alleges nothing at all regarding either defendant aside

from who they are and that Governor Walz signed the North Star Promise into law.[5] (Compl. ¶¶ 5, 17, 33.)

Standing also fails for lack of redressability: this Court could not order the governor or attorney general to do anything that would provide the United States with relief from its claimed injury. All defendants strongly dispute that the state laws at issue are preempted. But even if they were, this Court could not order the governor or attorney general to do anything about that because neither official plays any role with respect to the statutes. *See Digital Recognition*, 803 F.3d at 958 ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.")

## CONCLUSION

Section 1623 has no preemptive effect because it purports to regulate states, not individuals. Regardless, Minnesota does not provide benefits to undocumented students on the basis of residence, and it provides the same benefits to U.S. citizens without regard to their residence. The United States's reading of the statute is both contrary to its plain language and raises serious Tenth Amendment concerns. Finally, the United States lacks standing with respect to the governor and attorney general, who play no role with respect to the challenged laws. For these reasons, the Court should dismiss the complaint with prejudice and enter judgment for defendants.

---

[5] Defendants do not understand the complaint to allege that Governor Walz is subject to liability for signing a bill into law. Legislative immunity would bar any such claim. *See Church v. Missouri*, 913 F.3d 736, 751-54 (8th Cir. 2019); *Baraka v. McGreevey*, 481 F.3d 187, 197 (3d Cir. 2007); *Torres Rivera v. Calderon Serra*, 412 F.3d 205, 213 (1st Cir. 2005); *Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003).

Dated:  July 23, 2025                Respectfully submitted,

                                     KEITH ELLISON
                                     Attorney General
                                     State of Minnesota

                                     **s/ Joseph Richie**
                                     JOSEPH RICHIE
                                     Assistant Attorney General
                                     Atty. Reg. No. 0400615
                                     445 Minnesota Street, Suite 600
                                     St. Paul, Minnesota 55101-2131
                                     (651) 300-0921 (Voice)
                                     (651) 282-5832 (Fax)
                                     Joseph.Richie@ag.state.mn.us

                                     KATHERINE BIES
                                     Assistant Attorney General
                                     Atty. Reg. No. 0401675
                                     445 Minnesota Street, Suite 600
                                     St. Paul, Minnesota 55101-2131
                                     (651) 300-0917 (Voice)
                                     (651) 282-5832 (Fax)
                                     Katherine.Bies@ag.state.mn.us

                                     LIZ KRAMER
                                     Solicitor General
                                     Atty. Reg. No. 0325089
                                     445 Minnesota Street, Suite 600
                                     St. Paul, Minnesota 55101-2131
                                     (651) 757-1010 (Voice)
                                     (651) 282-5832 (Fax)
                                     liz.kramer@ag.state.mn.us

                                     *Attorneys For Defendants Tim Walz, Governor*
                                     *of Minnesota in his official capacity; State of*
                                     *Minnesota; Keith Ellison, Attorney General for*
                                     *the State of Minnesota in his official capacity;*
                                     *and the Minnesota Office of Higher Education*