# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>TIM WALZ, Governor of the State of Minnesota, in his official capacity, *et al.,*<br><br>*Defendants* | Case No.: 0:25-cv-02668-KMM-DTS |

**BRIEF OF FEDERATION FOR AMERICAN IMMIGRATION REFORM AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the Federation for American Immigration Reform ("FAIR") is a 501(c)(3) not-for-profit charitable organization incorporated in the District of Columbia. FAIR has no parent corporation. It does not issue stock.

# INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to inform the public about the effects of both unlawful and lawful immigration, and to defend American citizens, American workers, and the nation's environment by limiting overall immigration, enhancing border security, and ending illegal immigration. In short, FAIR seeks to protect all Americans against the substantial harms of mass migration by attaining strongly enforced, patriotic immigration reform. To that end, FAIR has been involved in more 100 legal cases since 1980, either as a party or as *amicus curiae*, in which it has consistently defended American interests against illegal immigration into the United States.[1]

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to

## INTRODUCTION

A principal aim of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") was to remove state-level incentives that encourage unlawful immigration by denying public benefits to aliens not lawfully present. To that end, Congress enacted 8 U.S.C. § 1623(a), which provides that "[n]otwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence … for any postsecondary education benefit unless a citizen … is eligible for such a benefit … without regard to … residence." Minnesota's DREAM Act, Minn. Stat. § 135A.043, and its North Star Promise, Minn. Stat. § 136A.1465, flout that clear command. Both statutes confer in-state tuition "on the basis of residence" through a three-year Minnesota high-school attendance proxy—a functional equivalent of domicile—while U.S. citizens who reside elsewhere, and who by definition cannot satisfy the residence proxy, remain ineligible. Those residency-tethered benefits are therefore expressly preempted by § 1623(a) and void under the Supremacy Clause; Governor Walz and the other defendants should therefore be enjoined from enforcing them.

fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

# ARGUMENT

I. **Congress has prohibited providing in-state tuition benefits to illegal aliens that are not also offered to out-of-state U.S. citizens.**

The Supremacy Clause of the Constitution provides that federal law is "the Supreme law of the land, … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Thus, "[a] fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). When a state enactment "contradict[s]" federal law, it is "without effect." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824).

There are three types of preemption: express, conflict, and field preemption. E.g., *N. Nat. Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 821 (8th Cir. 2004). Express preemption is "where Congress has expressly stated that it intends to prohibit state regulation in an area." *Id.* (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). Conflict preemption lies whenever the "ordinary meaning of federal and state law directly conflict" so that the two are in "logical contradiction." *Kansas v. Garcia*, 140 S. Ct. 791, 808 (2020) (Thomas, J., with whom Justice Gorsuch joins, concurring) (stating that preemption occurs when "the ordinary meaning of federal and state law directly conflict") (internal quotation marks and citation omitted).

3

In 1996, as part of the Illegal Immigration and Immigrant Responsibility Act, Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996) ("IIRIRA"), Congress enacted a variety of measures to discourage illegal immigration and strengthen the enforcement of federal immigration laws. One such provision, codified at 8 U.S.C. § 1623, is a one-sentence prohibition that forbids a state from providing resident tuition rates to any illegal alien unless that state provides resident tuition rates to all United States citizens, regardless of their states of residence:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623. Section 1623(a) thus confers on every U.S. citizen a federal right to receive any in-state-tuition benefit a State extends to unlawfully present aliens, regardless of the citizen's own state residency.

The Supreme Court has long held that legislative intent is the "ultimate touchstone in every pre-emption case." *Wyeth v. Levine,* 129 S. Ct. 1187, 1194 (2009); *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996). In determining that intent, a court must look to the "structure and purpose of the statute as a whole." *Id.* at 486. The legislative intent behind, and context of, 8 U.S.C. § 1623 confirms its objective of denying public benefits to illegal

4

aliens. And Congress expressed its intent to preempt contrary state laws by making its restriction on postsecondary education benefits in Section 1623(a) applicable "[n]otwithstanding any other provision of law."

In passing 8 U.S.C. § 1623, Congress sought to make it practically impossible for states to grant instate tuition to illegal aliens. The Conference Committee Report states: "This Section provides that illegal aliens are not eligible for in-state tuition rates at public institutions of higher education." Conference Report 104-828, H.R. 2202 (Sept. 24, 1996) (emphasis added), 6 Cong. Trends 1412. Statements by leading proponents of the measure in both the House and the Senate further confirm this objective.[2] In fact, every

---

[2] Senator Alan Simpson, the principal sponsor of the Senate version of the bill, summarized the provision as, "Illegal aliens will no longer be eligible for reduced in-State college tuition." 142 Cong. Rec. S11713 (1996). Senator Simpson reiterated this statement: "Without the prohibition on States treating illegal aliens more favorably than United States citizens, States will be able to make illegals eligible for reduced in-State tuition at taxpayer-funded State colleges." *Id.* at S11508.

Representative Christopher Cox, a leading proponent of the measure in the House, stated, "Title V says illegal aliens are not eligible for in-State tuition at public colleges, universities, technical and vocational schools." *Id.* at H25264. Representative Cox also explained that this provision would not be dropped in order to get President Clinton to sign IIRIRA: "The President wants to drop the provision that says . . . that when somebody comes from Thailand, when somebody comes from Russia, when somebody comes from you name it . . . into your State, they will not get in-State tuition benefits at your State college. Now if I move from California to Indiana, I am not going to get in-State benefits because I am from California, but illegal aliens, unless we pass this bill, are going to get in-State tuition." *Id.* at H25263-25264

Member of Congress who made a recorded statement concerning the text that would become 8 U.S.C. § 1623 agreed with the description contained in the Committee Report. *See United States v. Hayes,* 129 S. Ct. 1079, 1087 (2009) (rejecting a party's interpretation of a statute's text where the legislative record supported a contrary understanding and "contained no suggestion" supporting the party's interpretation).

In addition to IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (August 22, 1996), in which Congress explicitly codified its objective in denying public benefits to illegal aliens: "It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6). PRWORA therefore included a provision intended to stop the flow of state and local public benefits to illegal aliens. 8 U.S.C. § 1621(a).[3] The proscribed "public benefits" include "any ... postsecondary education ... or any other similar benefit ...." 8 U.S.C. § 1621(c). As Defendants observe, ECF 11 at 3, Congress did, however, create a savings clause: if a state nevertheless wanted to give a public benefit to illegal aliens, Congress would not stop the state from doing so, so long as

---

[3] A parallel PRWORA provision, codified at 8 U.S.C. § 1611, prohibits the federal government from providing public benefits to illegal aliens.

6

the state enacted a new law that "affirmatively provided" the public benefit to illegal aliens, to assure accountability to state taxpayers. 8 U.S.C. § 1621(d). Taken together, while Section 1621(d) allows states to provide discounted postsecondary tuition to unlawfully present aliens, Section 1623(a) prohibits such a benefit from being based on residence within the state such that it excludes nonresident citizens or nationals of the United States. Thus, while States are free to provide post-secondary education benefits to unlawfully present aliens, they must extend the same benefits to U.S. citizens regardless of residency. No one argues otherwise.

II. **Minnesota's Laws are Preempted.**

Minnesota's 2013 DREAM Act, Minn. Stat. § 135A.043 (2024), and 2023 North Star Promise, Minn. Stat. § 136A.1465 (2024), violate the purpose and text of Section 1623(a) because they classify unlawfully present aliens as Minnesota residents, and thus eligible for in-state tuition rates that are not offered to U.S. citizens who are residents of other states.

Despite the State's insistence that the DREAM Act "permits both citizens and noncitizens to qualify for 'resident tuition rate[s]'", ECF 11 at 5, unlawful aliens residing in the State are eligible for these rates as a matter of course in a way that U.S. citizen non-residents are not. By construing attendance at three years of Minnesota high school as distinct from domicile, the State attempts to sidestep § 1623's ban on benefits "on the basis of

7

residence," but this evasion fails because the three-year high school attendance criteria is a poor attempt to disguise such a benefit. 8 U.S.C. § 1623(a). The State describes this high school attendance criterion as "both broader and narrower," ECF 11 at 13, than a pure residency rule and invokes certain pathways for non-Minnesotans to receive in-state tuition: students who live in neighboring states but who attend high-school in Minnesota, select non-Minnesota resident students who attend boarding school in Minnesota, and former residents who move away after graduation. *See id*. These marginal examples are not representative of the vast majority of non-Minnesota students attending, or applying to, Minnesota postsecondary institutions who would be ineligible for in-state tuition in Minnesota. Only certain school districts within neighboring states have reciprocity agreements with Minnesota districts, which currently exist only with certain districts in Iowa and South Dakota. Minn. Dep't of Educ., *Interstate K-12 Tuition Agreements*, https://education.mn.gov/MDE/dse/schfin/GenEd/Agree (last visited Aug. 15, 2025). Students in these Iowa and South Dakota districts may attend a Minnesota high school only if their school district reimburses the Minnesota district. Minn. Stat. § 124D.04. The Iowa agreement, for example, permits enrollment across state lines "with the consent of both school districts," and expressly clarifies that it "is not open enrollment as defined in Iowa Code or Minnesota Statutes." *Iowa Tuition Agreement*

8

*Renewed FY26–FY30*, at 1 (June 25, 2025), https://education.mn.gov/MDE/dse/schfin/GenEd/Agree. Under the DREAM Act, eligibility requires three years of Minnesota high-school attendance; an ordinary out-of-state applicant attending high school in almost any other state cannot meet that criterion. Minn. Stat. §§ 136A.101, 135A.043. In practice, attendance and residence overlap almost completely, so Minnesota's proxy-based test is functionally indistinguishable from a residency-based conferral of benefits to illegal aliens.

The vast majority of students who satisfy the three-year attendance proxy are bona fide Minnesota residents, and out-of-state applicants to Minnesota universities who attend high school elsewhere will not satisfy the high-school attendance requirement. The State's reliance on marginal exceptions—students who board at Minnesota schools or live on the Minnesota border—does not alter this reality. According to Minnesota's logic, if they can cite a single example of an out of state resident who attends high school for three years in Minnesota, and is therefore eligible for in-state tuition rates, that would prove that Minnesota offers in-state tuition to non-residents. But for Minnesota to rely on this type of evidence for non-resident eligibility is to engage in a semantic game clearly at odds with both the objectives and text of Section 1623. Courts look to a law's practical, normal application, rather than marginal applications, to discern its effects.

*Henderson v. Mayor of N.Y.*, 92 U.S. 259, 268 (1875) ("In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect."); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Just as the 'inevitable effect of a statute on its face may render it unconstitutional,' a statute's stated purposes may also be considered." (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968))).

In their Motion to Dismiss, Defendants concede that Minnesota affirmatively seeks to provide in-state tuition to unlawfully present aliens for both political and economic reasons. Defendants open by invoking *Plyler v. Doe*, 457 U.S. 202 (1982), likening its provision of discounted postsecondary tuition to *Plyler*'s holding that children of unlawfully present aliens could not be denied access to public K–12 education. ECF 11 at 1. But *Plyler* addressed the unique and humanitarian imperative of K–12 education—preventing undocumented children from becoming illiterate and from becoming public charges. 457 U.S. at 221–23. That rationale is inapposite to subsidizing non-compulsory postsecondary education for unlawfully present aliens. But most importantly, no statute enacted by Congress restricted K-12 education benefits to illegal aliens as Section 1623(a) does here with respect to postsecondary education benefits. Accordingly, *Plyler* does not justify Minnesota's postsecondary tuition scheme.

In sum, Congress enacted § 1623(a) to prevent unlawfully present aliens from receiving postsecondary education benefits that are not available to U.S. citizens and nationals regardless of their residency. Minnesota's in-state tuition statutes confer benefits to unlawfully present aliens on the basis of residence and deny the same benefits to nonresident U.S. citizens in violation of Section 1623(a). Accordingly, those statutes are expressly and conflict-preempted by Section 1623(a).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated: August 21, 2025

Respectfully submitted,

/s/Harry N. Niska

Harry N. Niska (#391325)
**CROSSCASTLE PLLC**
2140 4th Avenue North
Anoka, MN 55303
P: (612) 429-8100
F: (612) 234-4766
sam.diehl@crosscastle.com
harry.niska@crosscastle.com

Gabriel R. Canaan*
**Federation for American
　Immigration Reform**
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 232-5590
gcanaan@fairus.org

**pro hac vice* forthcoming

**Attorneys for *Amicus Curiae*
Federation for American
　Immigration Reform**